MR. JUSTICE HARRISON,
dissenting.
Having carefully examined this record, I find that the most that can be said for the proof offered by the plaintiff is as follows:
1. Large ammunition was fired by the National Guard on the National Guard firing range near Deer Lodge, Montana.
2. Raver had large ammunition in his possession, which exploded and seriously injured the plaintiff.
The question before this Court was whether or not this proof made a jury issue; whether the shell could not have come from some other place?
In my opinion, the defendant’s witnesses established that the projectile that injured the plaintiff, could not have come from the Deer Lodge area because such a projectile had never been fired in that area. However, the jury could disbelieve this testimony and therefore we had to consider whether or not the plaintiff, by any manner, proved his case.
In my opinion, there was no testimony in the record linking the exploding projectile to ammunition used by the National Guard at its firing range near Deer Lodge. There is *509 no proximate cause evidence in the record to support the verdict in favor of the plaintiff. Therefore, while it can be argued that the shell could not likely have come from any other place; if the plaintiff has a case, it is on the basis that it came from some other place and is connected somehow to the defendant.
The following testimony of James Ficklin offered by respondent falls short of proving that the projectile came from the Deer Lodge area:
“Q. How did you know him?
“A. I worked approximately a year as a security guard during the time I was laid off in the pipe shop and I met Larry prior to that time because my father was head of security and I met Larry through stopping in his office.
“Q. At the time this accident occurred, what department were you employed at.
“A. I was a pipe fitter.
“Q. So you would have known Larry Raver before that time; is that correct?
“A. Yes.
“Q. Did you ever see a shell in Larry Raver’s possession up on the hill?
“A. I was working maintenance. I’m not sure of the exact date. It seems to me it was a couple weeks prior to when Mick was injured and Larry was killed. I parked at that time — I parked in a lot in front on the coal pulverizer which is adjacent to the converter building. I was late for work that day and Larry followed me into the lot and at that time — the conversation is fairly sketchy but he did specify that he had something that he wanted to show me that he found.
“MR. CHUMRAU: I object, Your Honor, on the basis of hearsay. THE COURT: Overruled.
“Q. (By Mr. Skakles) You recall this was approximately two weeks before the accident?
“A. It seems to me it was just prior to the accident.
“Q. Where were you when you talked to him at that time?
*510 “A. Well, there was an empty lot outside the converter building, outside the maintenance office, and that’s where the building was that was referred to as the coal pulverizer and this was across the road from that area.
“Q. When he pulled up behind you and stopped you, did he get out of the car?
“A. I pulled in and parked my vehicle and when I got out, Larry was outside of his truck but he had his door open. When I turned, I walked up and approached the vehicle and when I turned around, I could see some sort of projectile.
“Q. Did he say anything when you turned around?
“MR. CHUMRAU: I object, Your Honor, on the basis of hearsay. THE COURT: You may testify as to whether or not you had a conversation but not as to anything that was said.
“A. Could you clarify that?
“THE COURT: Did you have a conversation?
“A. Yes, we did.
“THE COURT: You may not testify as to anything that was said because that would be hearsay.
“Q. (By Mr. Skakles) How long did this episode take? A. Relatively short, a few seconds. I was late for work and once I saw what he had, I got a good enough glimpse that I knew it was a projectile and I don’t like things like that. I took off for work.
“Q. You entered into a casual conversation; is that correct? A. Not really.
“Q. Do you know why he pulled up behind you? A. I got the impression he wanted to show me that object because I do remember him stating—
“MR. CHUMRAU: I object, Your Honor, on the basis of hearsay. THE COURT: You may not testify as to anything said to you, Mr. Ficklin, but only as to the facts that took place and what was done but not what was said.
“Q. (By Mr. Skakles) It was a shell?
“A. Of some sort, yes.
*511 “MR. SKAKLES: I have no further questions.
THE COURT: You may cross-examine, Mr. Chumrau. CROSS-EXAMINATION BY MR. CHUMRAU:
“Q. Mr. Ficklin, we had a deposition with you earlier, didn’t we, in January of this year? A. Yes, we did.
“Q. And you were a pretty good friend of Larry Raver’s and Micky Jacques; is that correct? A. Yes.
“Q. You came from Washington to testify at this trial? A. Yes, I did.
“Q. Now, do you also remember that this object, this projectile, was kind of tarnished brown in color and anywhere from 8 to 12 inches— A. In my deposition, I believe I stated as close as I could tell it was 8 or 9 inches long. As for color, it had a brownish-greenish cast to it.
“Q. Brownish-greenish cast? A. That kind of rough cast to it. I believe at the time I said it looked like tarnish or — that metal or brass picks up.
“Q. Mr. Ficklin, as we said, we took your deposition at the end of January and at that time I asked you certain questions and you gave certain answers; is that true? A. Yes.
“Q. On that day in January, which was January 30th, 1981, was this question asked of you and this answer given by you? THE COURT: Show it to him first, counsel. A. Yes, I believe I did say that.
“Q. The question was: ‘You didn’t see any green color?’ and the answer was, ‘Not that I recall.’ Isn’t it also true that the shell was basically a consistent color and there was no dramatic change in color? I stated it was primarily one color. It was somewhat mottled from what I could see but it was fairly one consistency.
“Q. Now, Mr. Ficklin, isn’t it also true that you haven’t heard a specific description of the shell that actually exploded on February 6th; isn’t that true? A. No, I haven’t.
“Q. And you were not on duty that day? A. No, I was off on another shift.
“Q. So isn’t it true that you have no way of knowing the shell that exploded on that day was the same shell you saw *512 in his truck before work that day? A. No, I don’t.
“Q. In other words, it could have been a completely different shell; isn’t that true? A. I suppose it could have been.
“Q. Isn’t it also true that you think he got the shell out of the cab that you saw? A. From as near as I could tell, it was somewhere in the cab of the vehicle.
“MR. CHUMRAU: I have no further questions. THE COURT: Any redirect?
“MR. SKAKLES: I have no questions. THE COURT: You may step down, Mr. Ficklin.
“MR. SKAKLES: I call Harry Casey.”
However, there was excluded testimony which may have made a jury issue for the plaintiff. Here, the plaintiff sought to establish through the testimony of James Ficklin, a coworker, and Harry Casey, another co-employee, that the decedent, Raver, told each of the two witnesses that he obtained the shells from an area near Deer Lodge. The shells discussed in those conversations were large projectiles in the decedent’s possession weeks or months before the accident. The plaintiff’s proposed testimony, sought to be introduced through Ficklin and Casey, would not have established beyond doubt that the projectile that exploded came from the Deer Lodge area. However, since the shells, which he stated came from the firing range at Deer Lodge, are similar to the one which was exploded, it is my opinion that a jury issue on whether the exploding projectile came from the Deer Lodge area would be made on behalf of the plaintiff and, therefore, the crucial issue would become whether to admit the hearsay which was excluded by Judge Boyd.
The testimony that was excluded as hearsay was sustained without any reasons given. We do not know from the record whether the trial court considered certain exceptions to the hearsay rule. Had the trial court given its reasons for excluding said testimony, this court could have reviewed the correctness of the trial court’s rulings without deferring to the trial court’s discretion.
Here the plaintiff claims that statements of Raver made to *513 both Casey and Ficklin are admissible as declarations against interest. This brings us to interpretation of our Rule 804 of the Montana Rules of Evidence. The applicable portion of the rule reads as follows:
“(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
u
“(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant’s pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

U

“(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness.” Rule 804(b)(3), (5) Mont. R.Evid.
It is my opinion that it is stretching the rule to say that the proposed testimony constitutes a “statement against interest” as contemplated by the rule. It is my view of the law that we need not make that determination since I believe that these statements of the decedent should be admitted under subsection (5) other exceptions as set forth above. In attempting to determine the intent of subsection (5), it is necessary to go back to the commission comments. We should note that the Federal Rule 804(b)(5) governs other exceptions of the hearsay rule. The federal rule states:
“A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness. If the court determines that (A) the *514 statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by the admission of the statement into evidence. . Rule 804(b)(5), Fed.R.Evid.
Here the offered testimony qualifies under the guidelines enunciated specifically by the federal rule. That is to say, the offered testimony is “(1) material, and (2) more probative on the point than any other evidence which the plaintiff could offer, and (3) the ends of justice would be served.” The plaintiff has no other evidence to take this case to the jury. It certainly would frustrate the cause of justice to deny the admission of those statements.
Montana does not have a specific guideline setting forth the federal rule; our drafters of the Rules of Evidence for Montana wished to have the broader rule which would allow the admission of hearsay and which would not fall within the federal guidelines. See comments in “Montana Lawyers Rule Book,” at page 118.
It is obvious in reading the comments of the drafters of our rules of evidence that they wished to have a more liberal hearsay rule which would allow for the admission of evidence not contemplated as admissible under the federal rule. Since the testimony sought to be submitted by the plaintiff here would qualify under the federal guidelines it most certainly should be admitted under a more liberal Montana rule. I believe the following factors militate strongly in favor of the admission of testimony: (1) The de-clarant is deceased and therefore unavailable at trial; (2) there is nothing inherent in the circumstances of the statement which would indicate there was a motive on the part of the declarant to lie about the facts sought to be admitted; (3) the plaintiff cannot establish the fact in any other way; (4), the justice would be frustrated by the exclusion of such essential testimony.
*515 For the above reason, I would reverse and remand the case for retrial on the basis that there was insufficient evidence to support a verdict, but, with the admission of the excluded testimony, a jury issue might have been made.
In summation, I feel while there is not evidence in the record linking the exploding projectile to the National Guard firing range near Deer Lodge, with the admission of the testimony of Casey and Ficklin, a case might be made. Feeling that it was error to exclude this testimony, I would remand for retrial.